## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Jun 12 2019, 8:31 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Erin L. Berger
Evansville, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

David E. Corey
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In the Termination of the Parent-Child Relationship of:

J.T. (Minor Child)

and

A.R. (Mother) & J.T., Sr. (Father),

*Appellants-Respondents,*

v.

Indiana Department of Child Services,

*Appellee-Petitioner*

June 12, 2019

Court of Appeals Case No. 18A-JT-2899

Appeal from the Vanderburgh Superior Court

The Honorable Brett J. Niemeier, Judge

The Honorable Renee A. Ferguson, Magistrate

Trial Court Cause No. 82D04-1802-JT-353

**Altice, Judge.**

## Case Summary

[1]     A.R. (Mother) and J.T., Sr. (Father) appeal the termination of their parental rights to their minor child, J.T., Jr. (Child). Mother and Father (collectively, Parents) raise two issues on appeal. Initially, they contend that the factfinding hearing was neither commenced nor concluded within the statutorily-mandated timeframes set out in Ind. Code § 31-35-2-6. Parents also challenge the sufficiency of the evidence supporting the termination order.

[2]     We affirm.

## Facts & Procedural History

[3]     Mother and Father have had an on-and-off relationship for many years and are the parents of Child, born December 1, 2014. Mother had two other children for whom her parental rights have been terminated, one voluntarily in February 2008 and one involuntarily in December 2010.[1] Both Mother and Father have substance abuse issues and criminal histories, including convictions for battery.

[4]     The Indiana Department of Child Services (DCS) removed Child from Mother's care on July 27, 2016, after Child was brought to the local DCS office by family friends who had been caring for Child for a few days. Child had two

---

[1] Mother was nineteen and twenty-two years of age, respectively, at the time of these previous terminations of her parental rights. These children had different fathers, and Father was not one of them.

bruises on his forehead, an untreated diaper rash, a linear red mark on his lower back, and an abrasion on his left thigh. The two adults who brought in Child reported that they had witnessed him being struck with a belt and physical altercations between Mother and Father. Additionally, a report made earlier that month indicated that Child was a victim of neglect due to domestic violence between Parents, drug use, and the lack of utilities in the home.

[5] Mother submitted to a urinalysis and tested positive for THC. Her home had no electricity. Mother denied having much recent contact with Father and could not provide contact information for him. At the time, Mother was on parole for battery, and Father had a warrant out for his arrest. Domestic violence runs had been made to Mother's home as recently as the prior month.

[6] On July 28, 2016, DCS filed a petition alleging that Child was a child in need of services (CHINS). The petition outlined several concerns, including domestic violence, lack of electricity in the home, health and safety of Child, and illegal drug use by Parents. That same day, Parents appeared at the initial hearing in the CHINS matter. Mother stipulated to the allegations set out in the CHINS petition, and Child was adjudicated a CHINS. Regarding detention, the court ordered Child's continued placement in foster care.

[7] At the dispositional hearing on August 16, 2016 and pursuant to the agreed parental participation plan, Parents were ordered to, among other things, obtain substance abuse evaluations and follow any treatment recommendations, remain drug and alcohol free, and participate in parent aide programs, random drug

screens, and supervised or monitored visitation services. Additionally, the court ordered Father to establish paternity. The court took domestic violence counseling under advisement but ordered Parents to refrain from committing any acts of domestic violence and to immediately report any such future incidents to the DCS family case manager (FCM).

[8] By the first review hearing in January 2017, Parents had demonstrated a pattern of noncompliance with the court's orders. Specifically, they were not submitting to random drug screens or working consistently with the parent aide. Further, supervised visitation had been placed on a two-hour call ahead due to the high number of missed visits by Mother and, particularly, Father. Mother admitted her noncompliance and was found in contempt on January 17, 2017. The court sentenced Mother to "90 days in the Vanderburgh County Jail, under advisement." *Exhibits Vol. I* at 75. Father's information for contempt was continued until paternity was established.

[9] By the permanency hearing on June 20, 2017, Parents had made some progress but were still not in full compliance, as they had many missed drug screens and were positive for THC on those screens that they took. Mother obtained an initial assessment with Counseling for Change but never returned for recommended drug treatment, and she did not fully cooperate with the parent aide. As a result of her continued noncompliance, the trial court imposed thirty days of Mother's prior sentence for contempt. Additionally, Father had yet to establish paternity, having not shown up at the paternity hearing, and was arrested in early June on

a warrant for a domestic battery charge that involved Mother as the victim.[2] The court appointed special advocate (the CASA) recommended domestic violence services, but the court indicated that it would address this at the upcoming progress hearing. At the progress hearing on July 18, 2017, the court ordered domestic violence services for Parents.

[10] Theodore Parson took over as the family's FCM in September 2017. FCM Parson developed a good rapport with Parents and worked diligently to bring them into compliance with services. By December 2017, Parents were regularly attending their weekly visits with Child and were taking more initiative with regard to other court-ordered services, including working with the parent aide regarding housing and completing initial assessments with Counseling for Change. Parents and Child appeared very bonded, despite Child's diagnosis of reactive attachment disorder – a diagnosis that the CASA and FCM Parson believed should be reevaluated. At the time, Parents were homeless and had been unable to demonstrate an ability to refrain from smoking marijuana.

[11] In her December 2017 report to the court, the CASA addressed ongoing concerns regarding domestic violence. The CASA noted incidents in October and November 2017 that were concerning and opined that domestic violence was still a problem in the home. Though ordered by the court in July, Parents had yet to participate in domestic violence counseling.

---

[2] Father's paternity was established in August 2017.

[12] Due to the age of the CHINS case, on February 22, 2018, DCS filed the instant petition to involuntarily terminate the parent-child relationship between Parents and Child. Accordingly, in March 2018, the permanency plan in the CHINS proceedings was changed to a concurrent plan of reunification and adoption. The court in the CHINS proceedings specifically noted on the record at this time that Parents had not completed Counseling for Change or domestic violence treatment.

[13] The CASA's report to the court in the CHINS matter in May 2018 indicated that Parents were participating in some of the court-ordered services. They continued to attend once weekly visits with Child, which were monitored in their home. They completed work with their parent aide, obtaining appropriate housing in early 2018 and maintaining stable employment. Parents, however, continued to test positive for THC. After sporadic compliance with treatment through Counseling for Change, they were recently compliant with that service. Parents had not taken part in any domestic violence classes or counseling. The CASA continued to recommend termination of parental rights.

[14] Meanwhile, in the termination proceedings, the initial hearing was held on March 13, 2018. The parties agreed to June 11, 2018 for the factfinding hearing (the TPR hearing), which was beyond the ninety-day requirement of I.C. § 31-35-2-6(a)(1). At the conclusion of the initial hearing, the CASA noted that domestic violence counseling had been ordered and not started. Mother's attorney indicated that Parents wanted to complete substance abuse first through Counseling for Change and then address domestic violence counseling through

Homebuilders. The court encouraged Parents not to wait on getting some type of domestic violence counseling.

[15] At a pretrial hearing on May 22, 2018, Father requested a continuance of the TPR hearing and asked for intensive reunification services to begin in the home. DCS objected to a delay of the TPR hearing "based on time lines", and Father's counsel responded, "We're happy to waive the 180." *Transcript* at 21. Over DCS's objection, the court reset the date for the TPR hearing for August 15, 2018. The court ordered services to remain in place, including random drug screens, Counseling for Change, and visitation. Once again, the court ordered Parents to start domestic violence counseling. Finally, the court ordered intensive reunification services "[if] it becomes available." *Id*. at 25.

[16] On July 17, 2018, the court held a combined hearing – a pretrial hearing in the termination matter and a progress hearing in the CHINS matter. DCS caseworker Kimberly Nightingale, who had worked on Mother's previous CHINS and termination cases dating back to 2006, presented the court with her view of the case. Nightingale observed that Parents continued to use marijuana, which she described as one of the major points of noncompliance keeping Child out of their home. But Nightingale noted that she usually looks to "other indicators" in a TPR situation in addition to positive screens. *Id*. at 29. Accordingly, she recommended, on behalf of DCS, "a compromise position." *Id*. Nightingale explained:

> I want to see a service that the parents are not compliant with
> that has put them in a position of responsibility. Either not

appearing at appointments or not doing well on visits. We don't have that at this time. They are attending visits. We would like to see visitation time increased to three days a week. We're not asking that the child be returned to the home or visitations be in the home. But what we think would be appropriate is an increase to three days a week with parent/child interactive therapy…. I know we've got our trial date set…. What we're recommending in terms of services is that right now we (indiscernible) basically put some responsibility on them. Because without that I don't think we know what they can or cannot do as parents. And they will set themselves up or set us for either the best reunification case or the best termination case. Because if they can't make these appointments then it's on them.

*Id*. at 29-30.

[17] In response, the CASA expressed "major objections to increasing the visitation and beginning [interactive] therapy." *Id*. at 32. She noted that Child had been out of Parents' home for two years and had been in five different foster homes, while Parents had continued to test positive for THC and had not successfully completed Counseling for Change. The CASA opined that Child needed permanency and that interactive therapy should only be done with his permanent placement, which remained up in the air.

[18] Parents requested that the court "permit them to be able to do the parent interactive therapy." *Id*. at 32. Mother's counsel explained to the court:

I think it's hard to gauge whether a parent can parent when they're not really allowed to parent that much…. The THC is an issue that we obviously have to overcome that. I think our hopes that spending more time with the child will be the incentive that these parents need to stop doing this. This isn't a huge drug

addiction. It's not meth, it's not cocaine, it's not some of the
harder drugs that we see. But it is a street drug and it is illegal.
So we have discussed that with them. But I think our hope is
that spending more time with the child will make them
understand just how important this is and that they will finally do
what needs to be done so that this child can return to their care.
We've been so close to returning the child to their care.

*Id.* at 33. After verifying that Mother had tested positive for THC as recently as a week prior to this hearing, the trial court denied Parents' and DCS's request to increase visits and start interactive therapy. The court affirmed the TPR hearing date of August 15, 2018.

[19] The TPR hearing commenced as scheduled on August 15, 2018, with the CASA testifying. The remainder of the hearing was continued to August 27, 2018, upon Father's motion. None of the parties objected to the continuance.

[20] The CASA opined that termination of parental rights was in the best interests of Child "[b]ecause we have seen no improvement and the case has been ongoing for two solid years now." *Id.* at 43. The CASA acknowledged that Parents had been regularly visiting Child for nearly a year and that the weekly visits had gone well. Parents, however, had been noncompliant with drug screens and/or remaining drug free and had not successfully completed Counseling for Change. In fact, Father had been arrested and jailed on March 23, 2018 for possession of marijuana. Additionally, the CASA noted that Parents had not addressed their history of domestic violence despite being court-ordered, in July 2017, to obtain counseling.

[21] Father acknowledged a long history of marijuana use and past and present criminal charges/convictions related to marijuana and confirmed that he had been jailed more than once because of marijuana. Father stated that he would like to stop using marijuana but that he'd "been usin' it for so long it's a little difficult." *Id*. at 82. He attended intensive outpatient treatment (IOP) at Counseling for Change but continued to test positive and was discharged, having tested positive for THC again on June 26, 2018.

[22] Similarly, Mother testified that "[f]or the most part" she tested positive for marijuana for both DCS and Counseling for Change. *Id*. at 87. After several restarts, Mother had recently completed IOP through Counseling for Change, but she did not continue with the aftercare program as directed and tested positive for THC in July 2018. Despite their drug use, Mother and Father both had stable employment at the local Wendy's. Mother had worked there for over two years and testified that she was about to become a manager.

[23] FCM Parson testified, based on his experience, that he believed Parents were not likely to remedy the reasons that Child had been out of their care for the last two years. He explained:

> [Parents] basically got a lot of opportunities and didn't do anything with those opportunities…. When I am [wo]rking harder than the parents, and it became evident to me that I'm working harder than them and they're just coasting by, they didn't seem to me that they demonstrated that they knew what the big picture was here, which is getting [Child] back. I used the analogy as a runner that a marathoner, they need to be able to run marathons. And to me their actions have proven to me that

they can't run marathons. They can only run a short distance. Because I've coached them and trained them in how to run the marathon but they're not able to do it. It's either lack of training, lack of care, whatever the case may be.

*Id.* at 123. Further, FCM Parson opined that termination was in Child's best interests. He explained that Parents failed to show an ability to advocate for themselves or for Child, who has special needs with "a lot of issues", and that they did not make getting Child back a priority over other parts of their life, including marijuana use. *Id.* at 121. FCM Parson noted that "their history alone is showing a repeated pattern" of failing to "take the ownership" and do what is needed to be done "to make sure that this child is not a CHINS." *Id.* at 125. In sum, FCM Parson recommended termination because Child "[a]bsolutely" needs permanency now, which Parents were unlikely to be able to provide "based on their history, based on the defiance [of court orders], [and] based on their lack of advocating for their child." *Id.*

[24] At the TPR hearing, Parents presented evidence in opposition to termination. Specifically, they called Kimberly Hale as a witness. Hale had worked with them for several months as a parent aide and had handled the visits since July 2017. Hale testified that Parents and Child had a strong, loving bond and that she observed nothing that caused her concern during visits. Parents' home appeared safe and appropriate, with a room for child, and Child was always excited to visit them. Additionally, Hale testified that she had successfully worked with them regarding housing and obtaining food stamps.

Parents also called FCM Parson as a witness. He testified that despite lack of a vehicle and use of marijuana, Parents had both maintained employment and made every visit with Hale. Their house was also appropriate for placement of Child. FCM Parson acknowledged that a month prior to the TPR hearing, DCS had sought to increase visits or place Child in the home to start intensive reunification services to be able to monitor Parents' ability to care for Child in the home. The CASA was opposed to this request, which was ultimately rejected by the court.

Following the TPR hearing, the court issued its order on November 20, 2018, involuntarily terminating the parent-child relationship between Parents and Child. The order included extensive findings of fact and conclusions. Parents now appeal. Additional information will be provided below as needed.

## Discussion & Decision

### 1. Timeliness of TPR Hearing

I.C. § 31-35-2-6 sets forth the timeline for conducting factfinding hearings in parental rights termination proceedings. The statue provides in relevant part:

> (a) …. Whenever a hearing is requested under this chapter, the court shall:

>> (1) commence a hearing on the petition not more than ninety (90) days after a petition is filed under this chapter; and

> (2) complete a hearing on the petition not more than one
> hundred eighty (180) days after a petition is filed under
> this chapter.

> (b) If a hearing is not held within the time set forth in subsection
> (a), upon filing a motion with the court by a party, the court shall
> dismiss the petition to terminate the parent-child relationship
> without prejudice.

As Parents correctly observe, the TPR hearing was neither commenced within 90 days nor concluded within 180 days as statutorily required. Parents contend that the trial court, therefore, was required to dismiss the TPR petition.

[28]   I.C. § 31-35-2-6(b) provides a "specific enforcement mechanism" for noncompliance with the timelines set out in subsection (a) of the statute. *Matter of N.C.*, 83 N.E.3d 1265, 1268 (Ind. Ct. App. 2017). Specifically, a party may file a motion to dismiss in order to obtain dismissal on this ground. Parents did not do so below, likely because they were the impetus for delaying the proceedings beyond the 180 days.[3]

[29]   Recognizing that they did not file a motion for dismissal pursuant to I.C. § 31-35-2-6(b), Parents assert that the trial court should have sua sponte dismissed

---

[3] Relying on a case in the CHINS context, Parents argue that the statutory deadlines here cannot be extended by agreement of the parties. *See Matter of T.T.*, 110 N.E.3d 441, 443 (2018) ("To allow the parties to agree to dates beyond the maximum 120-day limit would thwart the legislative purpose of timely rehabilitation and reunification of families that are subject to CHINS proceedings."); *but see Matter of N.C.*, 83 N.E.3d at 1268 (termination proceeding in which parent "acquiesced to the setting of a fact-finding hearing date outside the statutory parameters" and, thus, was found to have "preserved no issue for appellate review regarding the application of Indiana Code Section 31-35-2-6"). We need not decide whether to extend the holding in *Matter of T.T.* to the termination context because, unlike that case, Parents never moved for dismissal below.

the TPR petitions and that its failure to do so constituted fundamental error. We cannot agree.

[30] Fundamental error is a "narrow exception to the waiver doctrine in that an 'error was so egregious and abhorrent to fundamental due process that the trial judge should or should not have acted, irrespective of the parties' failure to object or otherwise preserve the error for appeal.'" *In re G.P.*, 4 N.E.3d 1158, 1167 n.8 (Ind. 2014) (quoting *Whiting v. State*, 969 N.E.2d 24, 34 (Ind. 2012)). Further, "the harm or potential for harm therefrom must be substantial and appear clearly and prospectively." *In re E.E.*, 853 N.E.2d 1037, 1043 (Ind. Ct. App. 2006), *trans. denied*.

[31] Parents do not apply the fundamental error standard on appeal, and they do not argue that they were harmed by the fact the TPR hearing concluded five days past the statutory deadline. They simply assert that "a hearing [held] outside the maximum time frame mandated by the statute thwarts the legislative purpose of the time frames." *Appellants' Brief* at 17. Even assuming this is so, such does not establish fundamental error.

## 2. Sufficiency of the Evidence

[32] When reviewing the termination of parental rights, we will not reweigh the evidence or judge the credibility of the witnesses. *In re R.S.*, 56 N.E.3d 625, 628 (Ind. 2016). Instead, we consider only the evidence and reasonable inferences most favorable to the judgment. *In re D.D.*, 804 N.E.2d 258, 265 (Ind. Ct. App. 2004), *trans. denied*. In deference to the trial court's unique position to assess

the evidence, we will set aside its judgment terminating a parent-child relationship only if it is clearly erroneous. *In re L.S.*, 717 N.E.2d 204, 208 (Ind. Ct. App. 1999), *trans. denied*. In light of the applicable clear and convincing evidence standard, we review to determine whether the evidence clearly and convincingly supports the findings and whether the findings clearly and convincingly support the judgment. *In re R.S.*, 56 N.E.3d at 628.

[33] We recognize that the traditional right of parents to "establish a home and raise their children is protected by the Fourteenth Amendment of the United States Constitution." *In re M.B.,* 666 N.E.2d 73, 76 (Ind. Ct. App. 1996), *trans. denied*. Although parental rights are of constitutional dimension, the law provides for the termination of these rights when parents are unable or unwilling to meet their parental responsibilities. *In re R.H.*, 892 N.E.2d 144, 149 (Ind. Ct. App. 2008). In addition, a court must subordinate the interests of the parents to those of the child when evaluating the circumstances surrounding the termination. *In re K.S.*, 750 N.E.2d 832, 836 (Ind. Ct. App. 2001). The purpose of terminating parental rights is not to punish the parents, but to protect their children. *Id.*

[34] Before an involuntary termination of parental rights may occur in Indiana, DCS is required to allege and prove by clear and convincing evidence, among other things:

> (B) that one (1) of the following is true:

> (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
>
> (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
>
> (iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services[.]

Ind. Code § 31-35-2-4(b)(2)(B). DCS must also prove by clear and convincing evidence that termination is in the best interests of the child and that there is a satisfactory plan for the care and treatment of the child. I.C. § 31-35-2-4(b)(2)(C), (D).

[35] On appeal, Parents assert that DCS failed to present clear and convincing evidence that the conditions resulting in Child's removal would not be remedied, that the continuation of the parent-child relationship poses a threat to Child's well-being, and that termination is in the best interests of Child. We will address each of these in turn, as needed.

[36] Parents first contend that DCS failed to present clear and convincing evidence that there is a reasonable probability that the conditions resulting in Child's removal or continued placement outside the home will not be remedied. In deciding whether a reasonable probability exists that conditions will not be remedied, the trial court must judge a parent's fitness to care for her children at the time of the termination hearing, taking into consideration evidence of

changed conditions. *In re J.T.*, 742 N.E.2d 509, 512 (Ind. Ct. App. 2001), *trans. denied*. The court must also evaluate the parent's habitual patterns of conduct to determine whether there is a substantial probability of future neglect or deprivation of the children. *Id*. The court may consider evidence of the parent's prior criminal history, drug and alcohol abuse, history of neglect, failure to provide support, and lack of adequate housing and employment. *A.F. v. Marion Cty. Office of Family & Children*, 762 N.E.2d 1244, 1251 (Ind. Ct. App. 2002), *trans. denied*. The "delicate balance" of weighing a parent's recent improvements against habitual patterns of conduct is entrusted to the trial court, "which has discretion to weigh a parent's prior history more heavily than efforts made only shortly before termination." *In re E.M.*, 4 N.E.3d 636, 643 (Ind. 2014).

[37] Parents argue that at the time of the TPR hearing, they had stable, appropriate housing, sufficient income to provide for Child, and a strong bond with Child. Additionally, they had regularly participated in weekly visits with Child for the last year, with recent visits being unsupervised in their home. Parents assert that the only evidence of noncompliance was their ongoing "functional" use of marijuana. *Appellants' Brief* at 22.

[38] Although Parents had made strides in the months leading up to the TPR hearing, neither had successfully completed the IOP aftercare program through Counseling for Change and both continued to use marijuana. Parents claim to be functional users of the drug, but the evidence reveals that Father has several marijuana-related convictions and had been arrested for marijuana possession

just five months before the hearing, with charges still pending. Mother also had her probation revoked previously in a battery case based on use of illegal substances. Further, regarding noncompliance, Parents never addressed their history of domestic violence through court-ordered counseling and rarely complied with random drug screens.

[39] In its extensive findings, the trial court detailed the history of the case, Mother's previous termination cases related to two other children, Parents' substance abuse and criminal histories, and their lack of full compliance with drug treatment, drug screens, and domestic violence counseling. With regard to Father, the trial court's order states in part:

> Father states that a child needs parents that are sober, yet father has not demonstrated the ability to be a sober caregiver despite the services and opportunities that have been provided to him. Numerous periods of incarceration, and even the possibility of losing rights to his child, were not significant enough to effect a change in his behavior. This causes the Court grave concern for father's decision making skills and coping mechanisms as a parent.

*Appellants' Appendix Vol. II* at 19. Similarly, the court observed that Mother "did not change her pattern of choices and behavior with respect to use of illegal substances", and she chose not to comply with drug screens, even though "screens [were] one way she could demonstrate the ability to be responsible…." *Id.* at 20, 21.

[40] We find the following findings by the trial court particularly relevant here:

12. The Court acknowledges that the parents have attended visitation with the child…. However, attending visitation with a child is far different than being a child's parent on a 24 hour per day basis. The fact that the parents can attend a visit and exhibit no safety issues during that brief time does not negate the long pattern of behavior that the parents have displayed in terms of decision making. The parents have shown an inability to make decisions which are in the best interests of the child, such as the choice to continue to use illegal substances, which has jeopardized both their freedom and their relationship with the child. For this reason the Court does not believe that attendance at visits is sufficient to overcome the parents' other patterns of behavior with respect to the child.

13. Likewise, the Court acknowledges that the parents have obtained housing and employment, which are signs of stability. However, the Court also does not believe this stability is sufficient to overcome the pattern of behavior that the parents have displayed. Significantly, the Mother testified that she was not drug screening because she "didn't have time". Presumably, her work was one of the things that did require her attention at that time. However, working parents have to be able to balance both their employment and the needs of the child. The parents' failure to participate in drug screens while also working and meeting other obligations gives the Court reason to believe that they will have difficulty balancing the needs of the child against their own. Furthermore, the Court notes that one of the altercations which gave CASA cause for concern also happened at the parents' place of employment.

14. The child has special needs and has specific mental health diagnoses. The parents of this child need to be able to advocate for the child and put the child's needs first. The evidence before the Court does not indicate that they have full intent to do so. The parents have shown a commitment to some actions that benefit them, including obtaining housing and employment.

However, their actions that impact the child speak volumes. Their history of criminal activity and substance use, defiance of court orders, and lack of advocacy for themselves while the child is not in there [sic] care leads this Court to believe that they are even less likely to be able to meet the child's needs when he is in their care, and things are presumably even more hectic. As of the time of trial, the parents do not appear to have provided DCS with a plan of care for the child or a plan for schooling were he to return to their care.

15. [FCM Parson] met with the parents on at least 40 occasions in an attempt to help the parents achieve reunification …. Mr. Parson went so far as to assist the parents with transportation to appointments and court himself. Mr. Parson took the time to review the original and subsequent dispositional orders with the parents…. Mr. Parson advocated with treatment providers to let [Mother] back into treatment after they originally were not inclined to allow it. Mr. Parson consistently tried to refocus the parents on compliance with orders of the court, particularly the need to remain clean and sober. Mr. Parson continued to work with the parents even after termination of parental rights was filed. Although he did so in hopes that the parents could demonstrate some period of sobriety, the parents could never achieve that. Given the services the parents have been offered and the great lengths the family case manager went to to be a positive support for the parents, it does not appear that any other service could have assisted them with reunification beyond what they were provided. If any other services were to have been provided, Mr. Parson believed that those would have been intensive in-home services which DCS advocated for at one time, however, the parents could never refrain from using illegal substances in such a way as to make in-home placement and services an appropriate option.

16. DCS became involved with the family in part due to substance use issues. The child has remained out of the care of

the parents due to ongoing substance use issues.  After nearly two years of involvement, the Court still sees evidence of continuing use of illegal substances by the parents.  Father is currently facing charges for possession, and both parents admit to continued use of substances despite awareness of the severity of the consequences.  For this reason, the Court finds that the parents are unlikely to remedy the reasons that the child has remained out of their care….

*Id*. at 21-23.

[41]    Parents challenge only findings number 12 and 13 above, asserting that they are speculative because DCS never provided "wraparound services for the family to enable [Parents] to show their ability" to appropriately care for Child. *Appellants' Brief* at 23.  We observe that Parents appear to take no responsibility for the lack of progress in this case.  By the time of the TPR hearing, Child had been out of their care for over two years, and they had been visiting him only once a week for two hours at a time.  Parents waited until termination loomed to make any real effort to address their substance abuse.  The record establishes that intensive reunification services were on hold until Parents completed treatment at Counseling for Change and remained drug free so that Child could be returned to their home.  Parents never accomplished this despite ample opportunities, time, and support.[4]

---

[4] We note, as did the trial court, that "the time for parents to rehabilitate themselves is during the CHINS process, *prior* to the filing of the petition for termination.  The termination statutes do not require the court to give a parent additional time to meet his or her obligations under the Parent Participation Plan." *Prince v. Dep't of Child Servs.*, 861 N.E.2d 1223, 1230 (Ind. Ct. App. 2007) (emphasis in original).

[42] Although we recognize Parents' efforts regarding housing, employment, and visitation, we cannot say that it was clearly erroneous for the trial court to conclude that there exists a reasonable probability that the conditions resulting in Child's removal or continued placement outside Parents' home will not be remedied.[5] *See A.J. v. Marion Cty. Office of Family & Children*, 881 N.E.2d 706, 715 (Ind. Ct. App. 2008) (affirming termination despite mother's recent efforts in combating her marijuana addiction, because she had thirteen months to complete drug treatment and, at the time of the final hearing, "still had to complete seven weeks with the IOP aftercare program, as well as complete home-based counseling, which could not even begin unless or until Mother successfully completed the IOP"), *trans. denied*.

[43] While Parents challenge the trial court's best-interests determination, they do not provide a separate analysis beyond asserting that they are "not wholly unfit for the very survival of [Child]." *Appellants' Brief* at 24. Our Supreme Court long ago recognized that this is not the standard for determining the best interests of a child. *See Egly v. Blackford Cty. Dep't of Pub. Welfare*, 592 N.E.2d 1232, 1234 (Ind. 1992); *see also In re G.Y.*, 904 N.E.2d 1257, 1261 (Ind. 2009); *Bester v. Lake Cty. Office of Family & Children*, 839 N.E.2d 143, 148 (Ind. 2005).

---

[5] I.C. § 31-35-2-4(b)(2)(B) is written in the disjunctive. Therefore, having upheld the trial court's conclusion under I.C. § 31-35-2-4(b)(2)(B)(i), we need not review the trial court's determination that continuation of the parent-child relationship would pose a threat to Child's well-being.

In making a best-interests determination, the trial court is required to look beyond the factors identified by DCS and consider the totality of the evidence. *In re J.C.*, 994 N.E.2d 278, 290 (Ind. Ct. App. 2013). The court must subordinate the interests of the parents to those of the child and need not wait until a child is irreversibly harmed before terminating the parent-child relationship. *McBride v. Monroe Cty. Office of Family & Children*, 798 N.E.2d 185, 199 (Ind. Ct. App. 2003). Our Supreme Court has explained that "[p]ermanency is a central consideration in determining the best interests of a child." *In re G.Y.*, 904 N.E.2d at 1265. "Moreover, we have previously held that the recommendations of the case manager and court-appointed advocate to terminate parental rights, in addition to evidence that the conditions resulting in removal will not be remedied, is sufficient to show by clear and convincing evidence that termination is in the child's best interests." *In re J.S.*, 906 N.E.2d at 236.

In this case, the CASA and FCM Parson recommended adoption as in the best interests of Child. The trial court also provided additional findings to support its conclusion that termination of parental rights was in Child's best interests:

> 2. The child has made improvement, and while not in a pre-adoptive home, is adoptable.

> 3. This child has experienced significant trauma in his life. The child at one time was diagnosed with Reactive Attachment Disorder, and there are questions as to what the child's diagnosis may be going forward. The child is in need of a caregiver that is able to understand his needs and advocate for him. The parents

have not shown that they are able to be that caregiver. It is in the best interests of the child that the child be freed for adoption so that the process of finding an appropriate long-term caregiver can begin.

4. Due to the behaviors and actions of the parents, DCS has never been able to recommend that the child return home. The child should not have to wait any longer to determine if the parents are going to be able to remedy the reasons that he has not been returned home. It is clear that the parents are going to continue to engage in toxic behavior and make poor decisions, which is not in the best interests of the child.

*Appellants' Appendix Vol. II* at 23-24. The trial court's best-interest determination was supported by the findings and not clearly erroneous.

[46] We may reverse a termination of parental rights only upon a showing of clear error – that is, error which leaves us with a definite and firm conviction that a mistake has been made. *See A.J.*, 881 N.E.2d at 716. Based on the record before us, we cannot say that the trial court's termination of Mother's and Father's parental rights to Child was clearly erroneous.

[47] Judgment affirmed.

Kirsch, J. and Vaidik, C.J., concur.